**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| LASHUN T. VARNER,          ) | |
|       Plaintiff,         ) | |
|                   ) | |
|    v.                ) | Cause No. 2:12-CV-485-PRC |
|                   ) | |
| CAROLYN W. COLVIN, Commissioner   ) | |
| of the Social Security Administration,    ) | |
|       Defendant.      ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Lashun T. Varner on November 21, 2012, and Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [DE 17], filed on June 10, 2013. Ms. Varner requests that the Court remand the Administrative Law Judge's decision denying her disability insurance benefits and supplemental security income. On August 19, 2013, the Commissioner filed a response, and Ms. Varner filed a reply on September 3, 2013. For the reasons set forth below, Ms. Varner's request is granted.

## PROCEDURAL BACKGROUND

Plaintiff Lashun Varner filed applications for disability insurance benefits and supplemental security income on March 17, 2010. These applications were initially denied on May 27, 2010, and upon reconsideration on October 20, 2010. Ms. Varner timely requested a hearing, which took place on June 7, 2011, before Administrative Law Judge Mario Silva ("ALJ"). In appearance were Ms. Varner, her attorney Heather N. Garay, and vocational expert Leonard M. Fisher. The ALJ issued a written decision denying benefits on June 22, 2011, making the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.      The claimant engaged in substantial gainful activity during the following periods: second and third quarters of 2010 (20 CFR 404.1520(b), 404.1571 *et seq*, 416.920(b) and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: gastroparesis, obesity, and diabetes (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that she must have close proximity to and constant access to a bathroom.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on [], 1976 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 19, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 9-17).

On September 24, 2012, the Appeals Council denied Ms. Varner's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On November 21, 2012, Ms. Varner filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Commissioner's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### A. Background

Ms. Varner was 34 years old on the date of the ALJ's decision. She has a high school education and two years of college education. She has past relevant work experience as a cashier in a casino, a retail chain, and a fast food establishment. At the time of her hearing, she lived with her teenage daughter.

### B. Medical History

On July 17, 2009, Ms. Varner saw Dr. Bazaraa. She weighed 254 pounds. She reported no occupational changes. She also reported no stomach pain.

Ms. Varner saw her family practice physician, Farah Najamuddin, M.D., regarding her routine health needs, including her gastrointestinal complaints.

On February 5, 2010, Ms. Varner saw Dr. Najamuddin for a check up. She reported bouts of vomiting the week before but no more vomiting at the time of the visit. Her weight was 243 pounds. She was directed to follow up in one to two weeks.

On February 12, 2010, a Friday, Ms. Varner returned to Dr. Najamuddin. She weighed 248 pounds. She complained of nausea and vomiting since Monday that week but that she was doing better. She reported a history of gastroparesis. She was taking Reglan one time a day. Dr. Najamuddin advised increasing the Reglan.

On February 25, 2010, Ms. Varner returned for a check up and reported to Dr. Najamuddin that she was having episodes of nausea and vomiting with abdominal pain. She reported that her attacks were more frequent, occurring once a week and lasting for three or four days. She also reported that she had taken some time off from her job to have more tests and follow up. Dr. Najamuddin advised her to take Reglan four times a day. Ms. Varner's weight was recorded at 236 pounds. Dr. Najamuddin referred Ms. Varner to see Dr. Kudaimi for her gastrointestinal issues and Dr. Bazaraa for her diabetes.

On March 17, 2010, Ms. Varner visited Dr. Bazaraa. Ms. Varner's weight was 231 pounds; she indicated that she had lost 22 pounds. When asked about any significant lifestyle changes, she reported no occupational changes. She also reported no stomach pain.

On March 19, 2010, Ms. Varner saw Muhammad Kudaimi, M.D., for her gastrointestinal issues. Dr. Kudaimi's treatment record indicates that it had been nearly three years since Ms. Varner had seen Dr. Kudaimi. Ms. Varner weighed 234 pounds, and denied almost all symptoms. Much of the record is illegible.

On March 22, 2010, Ms. Varner reported to the Emergency Room Department of St. Catherine Hospital complaining of nausea and vomiting for a day.

On March 31, 2010, Ms. Varner underwent an esophagogastroduodenoscopy with multiple biopsies because of her complaints of persistent nausea and vomiting. The postoperative diagnosis

was "Gastroesophageal reflux disease, gastritis." (AR 266). Biopsy testing resulted in a diagnosis of mild chronic gastritis. Dr. Kudaimi ordered a further workup, including a CT scan of the head, gastric emptying study, colonoscopy, and anemia profile.

On April 5, 2010, Ms. Varner had a follow up visit with Dr. Najamuddin. Her weight was 244 pounds.

On April 7, 2010, Ms. Varner underwent a gastric emptying test. The test results showed that Ms. Varner had prolonged gastric emptying half time of 90 minutes. These findings were found to be consistent with mild to moderate gastroparesis.

On April 28, 2010, Dr. Bazaraa's office noted that Ms. Varner weighed 245 pounds and that she had gained weight. She reported no changes in her occupation.

On May 18, 2010, Ms. Varner underwent a consultative physical examination performed by J. Smejkal, M.D., at the request of the state agency. Ms. Varner reported to Dr. Smejkal that she was diagnosed with gastroparesis in 2000, that she was always throwing up and could not keep food down, and that she had an episode every week lasting four days at a time. She reported that she would suffer from vomiting and diarrhea at the same time and was on medication. Dr. Smejkal found Ms. Varner to have a normal clinical examination.

On May 25, 2010, Ms. Varner did not keep an appointment with Dr. Najamuddin.

On May 26, 2010, state agency reviewing physician R. Bond, M.D., completed a physical residual functional capacity assessment, finding that Ms. Varner could perform medium level work (occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, and sit 6 hours in an 8-hour workday).

On June 11, 2010, Ms. Varner reported to Dr. Najamuddin that she was "doing well" and was not suffering from nausea or vomiting. (AR 437). Ms. Varner's medications were continued. Her weight was 241 pounds.

On July 25, 2010, Ms. Varner reported to the Emergency Room Department of St. Catherine Hospital with complaints of right-sided abdominal pain with nausea initially. She reported that her last bowel movement had been the day before and had been normal. Ms. Varner denied nausea, vomiting, or diarrhea. Ms. Varner was administered pain medications. She was diagnosed with cystitis and an early urinary tract infection. Upon discharge, she vomited yellow bile. She was instructed to take small sips of liquids with ice and was given prescriptions for an antibiotic, pain medication, and a muscle relaxant.

On July 30, 2010, Ms. Varner saw Dr. Najamuddin after the emergency room visit for the urinary tract infection. She reported experiencing nausea at the time, but no headaches, fever, or abdominal pain. She reported that she began vomiting while in the emergency room. Dr. Najamuddin recommended that Ms. Varner continue taking the antibiotic she was prescribed at the hospital.

On October 4, 2010, Ms. Varner saw Dr. Najamuddin for a follow up. She reported being sick the prior week but that she was feeling better. She weighed 242 pounds.

On October 17, 2010, state agency reviewing physician, B. Whitley, M.D., reviewed the record and affirmed Dr. Bond's May 26, 2010 assessment.

On October 18, 2010, Ms. Varner saw Dr. Najamuddin for a follow up. Ms. Varner's weight was 238 pounds. Ms. Varner reported having an episode of nausea and vomiting four days earlier, but that she felt better although still weak. Dr. Najamuddin noted that Ms. Varner reported that her

job was "very stressful" and that she wanted to be off for two to three months. (AR 452). Dr. Najamuddin told her it was not possible and that she needed to talk to her supervisor and Dr. Bazaraa regarding adjusting her job.

On October 20, 2010, Ms. Varner saw Dr. Bazaraa for her diabetes. She complained of nausea and vomiting due to gastroparesis and reported that she was treated by Dr. Kudaimi. Dr. Bazaraa's office noted that Ms. Varner weighed 243 pounds. Ms. Varner indicated that she had lost weight. She reported no occupational changes. Ms. Varner reported that she felt "good" and that her appetite was "good." (AR 458). Dr. Bazaraa's staff noted that Ms. Varner was "very angry, wants disability." *Id*.

On December 23, 2010, Ms. Varner saw Dr. Bazaraa. Ms. Varner's weight was 247 pounds. She reported no occupational changes.

On February 11, 2011, Ms. Varner saw Dr. Najamuddin for a routine check up. Ms. Varner did not complain of gastrointestinal problems. Her weight was recorded as 251 pounds.

On February 25, 2011, Ms. Varner's weight was recorded at 250 pounds. Ms. Varner did not complain of gastrointestinal problems. Dr. Najamuddin reviewed Ms. Varner's labs with her and instructed her to see Dr. Bazaraa as soon as possible. There is no record of Ms. Varner following up with Dr. Bazaraa.

On April 26, 2011, Ms. Varner saw Dr. Najamuddin for medication refills. It was noted that she had been taking Dexilant 30mg and needed a refill.

### C. Ms. Varner's Hearing Testimony

Ms. Varner testified that she suffered gastroparesis attacks weekly and that a typical attack lasted between two and four days. She was prescribed Reglan for her gastroparesis. In addition to

gastroparesis, she suffered from diabetes. She was insulin dependent and gave herself four injections of insulin each day with a typical blood sugar reading of 170.

As of the date of the hearing, Ms. Varner was employed at Target as a cashier. She was paid hourly, and, although her schedule varied, she was typically scheduled to work between 20 and 25 hours each week. She testified that it was rare that she ever worked the full number of scheduled hours because her gastroparesis attacks caused her to frequently stay home from work or to leave work early due to her symptoms.

Ms. Varner explained that a typical attack starts with her stomach feeling nauseous. She would then start to sweat and vomit repeatedly. She would remain bed-ridden, lying still, and would suffer intermittent but ongoing bouts of vomiting and diarrhea. When she first started experiencing these attacks, she regularly saw her doctor. However, she testified that she started going less frequently to her doctor because there was nothing that her doctor could do for her during an attack; she testified that all the doctor could do was make sure she was not dehydrated.

Ms. Varner explained: "Well, when I'm sick, like I said, I vomit. I throw up, I'm weak, and I'm really bed bound and I sleep basically all the time until I feel like–well, I'm laying in the bed. Half the time I'm not asleep. I'm just in the bed with my eyes closed until I feel I'm about to throw up and I'm always just in the bathroom and I can't really do anything. I'm just in a bathroom because either my bowels are loose and I–well, most of the time my bowels are loose and I'm throwing up at the same time, so there's no way that I can do anything else other than." (AR 39-40).

She testified that when she was not suffering from a gastroparesis attack, she was able to perform household chores on a daily basis and complete her full scheduled hours at work. However, during the days that she suffered from a gastroparesis attack she was bed-bound and unable to take

care of her house or her daughter. During her attacks she relied heavily on family members, such as her mother, father, and sister to come to her house and help with cooking, cleaning and taking care of her daughter. She testified that when she is well, she can lift 50 pounds. She also testified that when she is working, she is standing up.

### D. Vocational Records

On May 4, 2011, Ms. Varner's employer, Target, approved her request for intermittent leave of absence status. This status permitted her to miss work up to ten times per month for ten hours at a time. When Ms. Varner was ill, she was required to report her absence to her local store and through the company's Interactive Voice Response system.

### E. Third-Party Adult Function Report

On April 20, 2010, Ms. Vernell Varner, Ms. Varner's mother, reported her opinion of her daughter's condition via a Third-Party Adult Function Report. This document provides that Ms. Varner was capable of walking, driving a car, handling money, shopping, attending church, and going to movies. Her mother indicates that Ms. Varner is able to work and, on those days when she is well, is capable of cooking, cleaning, and helping her daughter with homework. She also reports that Ms. Varner is able to socialize, has no trouble getting along with family and friends, and can follow spoken instructions. Ms. Varner's mother states that Ms. Varner is no longer able to work on a regular basis and that when she is ill, Ms. Varner is unable to dress, bathe, or eat.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse

only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate

and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have

an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Ms. Varner presents three arguments for remand of the ALJ's decision: (1) the ALJ failed to properly consider Ms. Varner's absences from work when determining her RFC, implicating the credibility determination, (2) the ALJ failed to properly credit the Third-Party Adult Function Report completed by Ms. Varner's mother, and (3) the ALJ improperly concluded that Ms. Varner engaged

in substantial gainful activity after her disability onset date. The Court addresses each argument in turn.

1.    *Medium Exertional Work and Absences*

As an initial matter, Ms. Varner does not contest the ALJ's finding that she can perform work at the medium exertional level, and the record supports the ALJ's RFC determination as to the exertional limitations. The ALJ relied on both Ms. Varner's physical consultative examination that was unremarkable as to physical limitations as well as her hearing testimony that she stands for her entire six-hour shift at Target and can lift approximately fifty pounds. *Id.*

Rather, Ms. Varner contends that the ALJ failed to build a logical bridge between the evidence of her frequent absences from work due to gastroparesis and the Vocational Expert's testimony that a person who misses more than one workday per month will have trouble sustaining competitive employment. Ms. Varner argues that she "missed a significant number of days each month during her employment as a cashier with Target due to severe gastroparesis attacks" and that her absences from work at Target are proof that she is unable to work. (Pl. Br. 7, 8). She points to her hearing testimony that her attacks came without warning and cause her to leave work early or miss work. She gave an example of working for 30 minutes and then having to leave because of the onset of the attack at work. Ms. Varner notes that she was prescribed Reglan to help manage her symptoms. She also points to the record of her absences from work at Target: February 2010 (10 days), March 2010 (31 days), April 2010 (28 days), June 2010 (1 day), July 2010 (6 days), August 2010 (1 day), September 2010 (5 days), October 2010 (3 days), November 2010 (3 days), January 2011 (6 days), February 2011 (2 days), April 2011 (3 days). She was then placed on intermittent leave from Target for a one-year period beginning in April 2011, which allowed her to miss work

up to 10 times per month for 10 hours at a time. The procedure for taking intermittent leave required only that the she report the absence by telephone.

The regulations provide that a claimant must be unable to work due to her medically determinable impairment. 20 C.F.R. §§ 404.1505(a), 416.905(a). In his decision, the ALJ recognized that Ms. Varner had missed work due to her severe impairments, citing the Leave of Absence record from Target, and that Ms. Varner suffers from bouts of vomiting and nausea. Nevertheless, the ALJ found that the frequency of Ms. Varner's attacks was not supported by the objective evidence of record, the State Agency physicians' opinions, and Ms. Varner's earnings records. Thus, he found that an RFC for medium work with the additional restriction to being in close proximity and having constant access to a bathroom accommodated her limitations. Ms. Varner argues that the ALJ made several errors in evaluating and weighing this evidence that resulted in him finding that her alleged limitations are not supported by the record.

First, Ms. Varner asserts that the ALJ ignored "all absentee records." (Pl. Br. 8). This is incorrect. As noted, the ALJ first cited the Target Leave of Absence records. Then, in discrediting the extent of the effects of her gastroparesis, the ALJ noted that there is no evidence that she missed work on those days at the direction of her physician. This observation by the ALJ is supported by the record; Ms. Varner testified she did not have a doctor's note for the days that she missed work. When asked by the ALJ at the hearing whether she had a report from any doctor indicating that she is unable to work on a full-time basis, Ms. Varner answered in the negative. *See Hamilton v. Colvin*, 525 F. App'x 433, 439 (7th Cir. 2013) ("While the ALJ is right that the ultimate question of disability is reserved to the Commissioner, a treating physician's opinion that a claimant is disabled

must not be disregarded.") (internal quotation marks omitted) (quoting SSR 96-5p; citing 20 C.F.R. § 416.927(e)(2); *Roddy*, 705 F.3d at 631).

The Commissioner is correct in her response brief that Target's intermittent leave policy, which allowed Ms. Varner flexibility in taking leave, does not by itself constitute a finding that Ms. Varner is disabled for purposes of the disability determination. *See* 20 C.F.R. §§ 404.1504, 416.904 (establishing that disability determinations by nongovernmental agencies are not relevant to a determination by the Social Security Administration, which must make its own disability determination). Yet, the ALJ failed to discuss the fact that, under its intermittent leave policy, Target did not require a doctor's note for Ms. Varner to call off of work due to a gastroparesis attack. He also failed to discuss the testimony he elicited from Ms. Varner at the hearing that for each of the absences, she called off work, even if she did not have a doctor's note. Thus, although it was proper for the ALJ to consider the Target leave records, there is a gap in the factual evidence as to the reason that Ms. Varner took that leave that undercuts the ALJ's use of the records to discredit her testimony. This is further compounded, as discussed below, by other aspects of the ALJ's credibility determination.

When making a credibility determination, once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. §§ 404.1529(a); 416.929(a). The ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work, although subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh these subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: (1) The individual's daily

activities; (2) Location, duration, frequency, and intensity of pain or other symptoms; (3) Precipitating and aggravating factors; (4) Type, dosage, effectiveness, and side effects of any medication; (5) Treatment, other than medication, for relief of pain or other symptoms; (6) Other measures taken to relieve pain or other symptoms; (7) Other factors concerning functional limitations due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

When evaluating the record as a whole, the ALJ also considers any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1); 416.929(c)(1). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

Without explanation, Ms. Varner accuses the ALJ of failing to credit her excessive absenteeism without discussion of the medical records. This is also untrue. The ALJ's decision reveals that the ALJ did not simply dictate a boilerplate conclusion as to Ms. Varner's credibility. *See Filus v. Astrue*, 694 F.3d. 863, 868 (7th Cir. 2012) (explaining that if the ALJ includes this boilerplate language but explains his conclusion adequately, the inclusion of that language is harmless and remand is unwarranted on that basis alone). The ALJ discussed the course of Ms. Varner's treatment, beginning before her onset date and continuing through the available medical

records, for more than a page of the decision (AR 13-15). The ALJ noted that, although Ms. Varner was treated for attacks, her treatment records do not support the frequency of attacks she alleged, and he cites her treatment records. Specifically, the ALJ went on to discuss the treatment by her primary care physician, Dr. Najamuddin, for diabetes, hypertension, and gastroparesis, the fact that she had been treating with Dr. Najamuddin since 2001, and that five months prior to her onset date she reported "doing well." The ALJ then thoroughly discussed Dr. Bazaraa's treatment of her diabetes. (However, Ms. Varner does not object to the ALJ's assessment of her diabetes).

Perhaps most importantly, and unacknowledged by Ms. Varner, the ALJ reviewed in detail the limited treatment of Ms. Varner by Dr. Kudaimi, a gastroenterologist. The ALJ noted the referral to Dr. Kudaimi by Dr. Najamuddin, the March 31, 2010 esophagogastroduodenoscopy that revealed gastroesophageal reflux disease and gastritis, and the labs that were generally unremarkable except for an iron deficiency. The ALJ reviewed the results of the April 2010 colonoscopy and gastric emptying study and noted that Dr. Kudaimi kept Ms. Varner on Reglan. Recognizing that there were no subsequent treatment records with Dr. Kudaimi after April 2010, the ALJ also noted that Ms. Varner returned to her family doctor instead of a specialist for ongoing treatment. *Id.*

The ALJ continued with an evaluation of her emergency room treatments in March 2010 for nausea and vomiting, which occurred during this period of evaluation and adjustment of her Reglan, and in July 2010 for flank pain. The ALJ recognized that the consultative physician examination was essentially normal except for her subjective complaints. The ALJ noted the lack of any opinion of disability from a treating physician and the lack of any statement of limitation by a treating physician greater than those found by the ALJ in the RFC. The ALJ noted contrary evidence, writing: "In fact, October 2010 records from the claimant's family physician indicate that the

claimant reported that her job was very stressful and that she wanted to be off work for two to three months. However, Dr. Najamuddin indicated that was not possible and that she needed to talk to her supervisor and Dr. Bazaraa regarding adjusting her job." (AR 15).

Nevertheless, remand is required because of other errors in the ALJ's credibility analysis. First, Ms. Varner argues that the ALJ improperly discredited her testimony about her absenteeism by drawing a negative inference from Ms. Varner's failure to continue to treat with a specialist without exploring Ms. Varner's reasons for her failure to do so. The Court agrees. "[A]n ALJ must consider reasons for a claimant's lack of treatment (such as an inability to pay) before drawing negative inferences about the claimant's symptoms." *Thomas v. Colvin*, 534 F. App'x 546, 552 (7th Cir. 2013) (citing *Roddy*, 705 F.3d at 638); *Shauger v.* Astrue, 675 F.3d 690, 696 (7th Cir. 2012); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see also* SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996). "The explanations provided by the individual may provide insight into the individual's credibility." SSR 96-7p, at *8. Two examples of such explanations listed in the Ruling that are applicable in this case are: (1) "The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications," and (2) "The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." *Id.*

The ALJ recognized that Ms. Varner received some treatment and diagnostic testing from specialist Dr. Kudaimi, but discredited her based on the lack of ongoing treatment with the specialist. At the hearing, Ms. Varner testified that she initially saw her treating physician on a

regular basis for every attack but that her visits became more sporadic and that she did not go to the doctor for every attack. She explained, "I'm able to handle it on my own and when I go to the doctor, there's really nothing that she can do for me. She's just looking at me to make sure that I'm not dehydrated." (AR 39). Thus, there is evidence of record that satisfies SSR 96-7p, yet the ALJ did not discuss it.

While the ALJ writes that "the records do indicate some treatment for her attacks (Exhibits 2F, 4F, and 7f), they do not substantiate the frequency of the attacks that she alleges," (AR 13), the ALJ does not discuss the content of those treatment records. The Commissioner offers an explanation in her response brief for why certain records do not support Ms. Varner's claims, but these reasons were not discussed by the ALJ, and Ms. Varner offers counter-arguments as to why the same evidence supports her claims of ongoing attacks and her testimony about the decrease in treatment (such as the fact that dehydration and abdominal pain are symptoms of gastroparesis). Also, as noted above, the ALJ emphasizes the fact that 5 months *before* the onset date, Ms. Varner was doing well. But that was *before* the onset date and before the coinciding increase in her attacks, treatment visits, absences from work, and increase in her medication. The ALJ does not discuss these facts.

The Court notes that Ms. Varner's medical records and the leave records from Target appear to suggest that Ms. Varner's gastroparesis may have became more controlled with the increase of her Reglan from 1 time per day to 4 times per day. However, the ALJ did not explore this evidence, and it is not the Court's place to do so. Although it is Ms. Varner's burden to offer evidence at steps one through four of the sequential evaluation process, the ALJ must discuss the evidence she offers.

Because the ALJ committed legal error by not discussing Ms. Varner's explanation for the frequency of treatment and lack of ongoing treatment with a specialist, remand is required.

Next, Ms. Varner argues that the ALJ played doctor when he found her less credible as to the frequency of her attacks because her weight was too stable. In downplaying Ms. Varner's absences from work at Target, the ALJ wrote that Ms. Varner's "weight is not suggestive of frequent, weekly attacks. She testified that she is unable to eat for the duration of her attacks; however, her weight has remained relatively constant since her alleged onset date." (AR 13). In drawing this conclusion, the ALJ impermissibly reached an independent medical conclusion by finding that lack of weight loss is inconsistent with ongoing gastroparesis attacks. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The inference that someone whose weight has remained relatively steady cannot suffer from gastroparesis is not supported by the opinion of any doctor of record.

As noted by the Commissioner, gastroparesis is understood to cause weight *loss* and malnutrition. (Def. Br. 9) (citing Gastroparesis, U.S. National Library of Medicine–PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001342/ (explaining that "weight loss without trying" is one of symptoms of gastroparesis); Symptoms of Gastroparesis, Mayo Clinic, available at: http://www.mayoclinic.com/health/gastroparesis/DS00612 (explaining that "weight loss and malnutrition" are symptoms of gastroparesis)). However, as noted by Ms. Varner, weight *gain* can also be a symptom of gastroparesis. (Pl. Reply 2) (citing http://www.surgery.usc.edu/uppergi-general/gastroparesisinstitute-causessymptoms.html (recommending that treatment be sought if there is "[e]xcessive weight gain over the past year due to improper nutrition resulting from chronic nausea and/or vomiting");

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2653292/ (recognizing weight gain as a symptom); http://www.gastroparesisuk.org/page1.html (same)).

As noted in the background section, Ms. Varner's weight stayed relatively constant; however, she lost 22 pounds in March 2010, which was during the time that she was frequently seeking treatment and her Reglan was being adjusted. The ALJ did not discuss this weight loss. At the hearing, the ALJ went so far as to ask Ms. Varner, "[H]ow are you able to maintain your weight if you have difficulty eating," and she responded, "I think I make up for it when I feel better." (AR 38). The ALJ did not discuss this testimony. It was error for the ALJ to make a medical determination that Ms. Varner's stable weight decreased the credibility of the frequency of her attacks, especially in light of this other evidence of record that he did not discuss.

Having considered the ALJ's analysis, the hearing testimony, and the evidence of record, the ALJ properly relied on some aspects of the evidence to find Ms. Varner not fully credible as to the reason for her absences, including the objective medical findings of gastroenterologist Dr. Kudaimi, the lack of restrictions imposed by her treating physicians, and the treatment note from Dr. Najamuddin declining to excuse her from work. However, the ALJ's emphasis in the credibility determination on the improper consideration of Ms. Varner's lack of weight loss, infrequency of treatment for attacks, and lack of ongoing treatment by a specialist means that the Court cannot tell whether the ALJ's decision would have been the same if he had properly considered these factors. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.") (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). For these reasons, the Court remands for further proceedings.

## 2. Third-Party Adult Function Report

Ms. Varner argues that the ALJ did not properly credit the Third-Party Adult Function Report completed by her mother, Vernell Varner, in violation of Social Security Ruling 06-3p, because the ALJ did not explain which statements he found credible and because he did not assess why Ms. Varner's mother's statements are deserving of only "some weight." (AR 15).

The regulations distinguish between opinions from "acceptable medical sources" and other health care providers who are not "acceptable medical sources." *See* 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a),(d)(1). In addition, the regulations provide that an ALJ may consider information from "non-medical sources," which includes parents. *See* 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4); *see also* SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (listing "other sources" as defined in §§ 404.1513(d) and 416.913(d) as including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers."). Social Security Ruling 06-3p clarifies how opinions from sources that are not "acceptable medical sources" are considered. *See* SSR 06-3p, at *1. In considering statements from "other sources," "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id*.[1]

---

[1] Ms. Varner's citation to *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), which addressed boilerplate determinations of the claimant's credibility and not the opinions from "other sources," is misplaced. In addition, Ms. Varner incorrectly attributes to *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011), the quotation: "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." The quotation is from *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

First, the ALJ did not err in discounting the weight given to Ms. Varner's mother because he explained that he "recognize[d] the potential for bias given the familial relationship between the claimant and [her mother]." (AR 15). This is consistent with the mandate of SSR 06-3p that when an ALJ weighs the opinion of "other sources," such as a parent, "it [is] appropriate to consider such factors as the nature and extent of the relationship." SSR 06-3p, at *6.

However, it is troubling that the ALJ does not specify which parts of Ms. Varner's mother's testimony to which he gives some weight. *See Allen v. Astrue*, 1:11-CV-01485, 2012 WL 6094169 (S.D. Ind. Dec. 7, 2012). Ms. Varner's mother's statements in the report are generally consistent with Ms. Varner's testimony that she is able to function at normal levels most of the time but that when she is suffering from a gastroparesis attack, which includes constant nausea, vomiting, and diarrhea, she is unable to care for herself or her daughter and relies on her parents to help. On remand, the ALJ shall explain which of Ms. Varner's statements he credits.

3.    *Substantial Gainful Activity*

At step one of the sequential analysis, the ALJ found that Ms. Varner engaged in substantial gainful activity ("SGA") during the second and third quarters of 2010. SGA is defined as work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. However, work that is stopped or reduced below the SGA level after a short time *because of an impairment* is considered an unsuccessful work attempt. *See* 20 C.F.R. § 404.1574(a)(1), 416.974(a)(1); *see also* SSR 05-02, 2005 WL 568616, at * (Feb. 28, 2005). The regulations and ruling provide a framework for determining whether a claimant experienced an unsuccessful work attempt.

Ms. Varner argues that, even though she had earnings above the SGA level in those quarters of 2010, the ALJ should have treated the work in those quarters as an unsuccessful work attempt because her work at Target was drastically reduced and she was ultimately placed on Intermittent Leave status. The Commissioner responds that Ms. Varner has not shown that she missed work because of her impairment. On remand, the ALJ shall consider whether Ms. Varner's work in the second and third quarters of 2010 constituted an unsuccessful work attempt under the regulations.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Plaintiff's Motion for Summary Judgment [DE 17] and **REMANDS** this case for further proceedings consistent with this Opinion and Order.

So ORDERED this 20th day of March, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record